NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia


Decided: February 7, 2023


S22A0885.  WILSON v. THE STATE.


PINSON, Justice.

Antonio Wilson was convicted of felony murder in connection with the shooting death of Tre Griffin.[1] On appeal, he contends that

---

[1] The crimes occurred on November 19, 2017. On April 24, 2018, a DeKalb County grand jury returned an indictment against Wilson and two co-defendants, Adonis Lewis and Braindon Cayo; a superseding indictment was issued on February 5, 2019. The superseding indictment charged the defendants with malice murder (Count 1), felony murder predicated on armed robbery (Count 2), felony murder predicated on aggravated assault (Count 3), felony murder predicated on conspiracy to violate the Georgia Controlled Substances Act (Count 4), armed robbery (Count 5), aggravated assault (Count 6), conspiracy to violate the Georgia Controlled Substances Act (Count 7), and possession of a firearm during the commission of a felony (Count 8). Co-defendant Lewis pleaded guilty to all charges. Co-defendant Cayo pleaded guilty to Counts 7 and 8 and pleaded guilty to the reduced charges of voluntary manslaughter and robbery as to Counts 4 and 5, with his remaining charges nolle prossed. Wilson pleaded not guilty and was tried by a jury from July 15 to 19, 2019. The jury found him guilty of Counts 4 and 7 and not guilty of the remaining charges. He was sentenced to life in prison without the possibility of parole for Count 4, with Count 7 merging into Count 4 for sentencing purposes. Wilson, through new counsel, filed a timely motion for new trial, which the trial court denied after a hearing. Wilson filed a timely notice of appeal. The case was docketed to the August 2022 term of this Court and submitted for a decision on the briefs.

(1) the evidence was not sufficient to support his conviction for conspiracy to purchase marijuana; (2) his indictment did not adequately describe that drug-conspiracy charge, which was the predicate felony for his felony-murder charge; (3) the State failed to prove that the predicate felony proximately caused the victim's death; (4) the trial court failed to properly instruct the jury that a felony-murder conviction must be based on proof that the predicate felony proximately caused the death; (5) the trial court did not properly instruct the jury on conspiracy to possess marijuana as a lesser included offense of conspiracy to purchase marijuana; (6) the trial court improperly instructed the jury about proof of participation in a conspiracy; (7) the trial court improperly admitted irrelevant and prejudicial evidence, including a homemade rap video and Instagram messages from Wilson to a co-defendant; and (8) the trial court improperly imposed a sentence of life without parole.

Each of these claims fails. The evidence was sufficient to support Wilson's drug-conspiracy conviction. The indictment satisfied due process because the predicate felony for the felony

2

murder charge was fully described in a separate count. The State established that the predicate felony—conspiracy to purchase marijuana—proximately caused Griffin's death, because it was reasonably foreseeable that violence could ensue during the planned transaction in illegal drugs, which our decisions have consistently recognized are inherently dangerous. The trial court was not required to give Wilson's requested jury instructions: the court's instructions on proximate cause and proof of participation in a conspiracy included all the points of law that Wilson's requested instructions contained, and no evidence could support a theory that Wilson was guilty only of conspiracy to possess marijuana but not conspiracy to purchase because, on the facts here, any conspiracy to possess the marijuana necessarily included the step of purchasing it from Griffin. The trial court did not abuse its discretion in admitting the homemade rap video and the Instagram messages, which were probative because they connected the defendants to the murder weapon and showed them in close association, and did not give rise to a substantial danger of unfair prejudice. Finally, the trial court

3

could sentence Wilson to life without parole without any finding of aggravating factors, and the record does not show that the court relied on improper factors in doing so. So we affirm Wilson's convictions and sentence.

1. Viewed in the light most favorable to the verdicts, the evidence at trial showed the following.

(a) On the morning of the shooting, Wilson was at Braindon Cayo's house smoking marijuana with Cayo, Adonis Lewis, Cayo's girlfriend, Britney Coleman, and Wilson's girlfriend, Auviance West. At around 2:00 p.m. they were joined by Jalene Wright.

The group discussed going to buy more marijuana from Lewis's regular dealer, Griffin. Wilson was involved in the planning: West testified that she gave Wilson money because "[h]e said he was going to go buy weed," and Wright testified that Cayo asked her, on behalf of himself, Wilson, and Lewis, if they could borrow her car to go make the purchase.

Wilson, Cayo, Lewis, Coleman, and Wright left in Wright's car to drive to Griffin's house; West stayed behind. According to

4

Coleman, Cayo drove while Lewis talked to Griffin on the phone. Wright testified that "[t]he boys" were talking about not paying for the marijuana that they had ordered. Among other things, Cayo and Lewis knew that Griffin would use a scale to weigh the marijuana, and they were planning to have him place the scale on the ground "[s]o he wouldn't be looking around."

The group arrived at Griffin's house. Lewis got out of the car and stood by the driver's side door. Griffin came down the driveway carrying a bookbag and wearing a gun on his hip. Lewis and Griffin greeted each other, and Lewis got out the money while Griffin pulled marijuana and a scale from his bookbag. Griffin put the scale on the ground by the driver's side door to weigh the marijuana. Lewis stood nearby.

Wilson got out of the passenger side of the car and walked around to the driver's side where Griffin was. A few seconds later, Griffin was shot. No one admitted to seeing the actual shooting. But Coleman, Wright, Cayo, and Lewis all testified that they saw Wilson holding a gun afterwards, either just after the shooting or in the car

on the way back to Cayo's house.

Lewis picked up Griffin's bookbag and got back in the car. On the way back to Cayo's house, Wilson took the SIM card from Griffin's phone and Cayo threw the phone out the window. When they arrived at Cayo's house, Wilson, Cayo, and Lewis divided up the marijuana from the bookbag. Then they burned the bookbag and talked about selling the murder weapon. Wilson reported to West, "we robbed him."

(b) Right after Griffin was shot, his mother called 911. Investigators at the scene got Griffin's phone number from his family and obtained a description of the car that was seen driving away from the shooting. In the following weeks, police got a tip that led them to Wright. They then found Wright on social media and were able to connect her to the car. When Wright was interviewed by police, she told them that on the day of the shooting she went to Cayo's house and that "all three of the guys at the house"—Cayo, Lewis, and Wilson—went to buy marijuana. She admitted later that she and Coleman went with them.

6

Police also obtained significant information from cell-phone data. Griffin's phone records showed that five minutes before his mother called 911, he received a call from a phone that was later connected to Lewis's mother. Police obtained the records and data from Lewis's mother's phone and found that the phone call to Griffin pinged a cell tower that was a half mile from Griffin's house. Lewis's mother's phone also contained photos of Cayo and Lewis holding a handgun. A firearms expert from the Georgia Bureau of Investigation testified that the handgun in the photos appeared to be a Smith & Wesson SD9, and that the bullet recovered from Griffin's body could have been fired from that type of gun. And Lewis's mother's phone also contained a text message conversation that included a YouTube link to a rap video entitled "Dope," in which Cayo, Lewis, and Wilson appeared and Cayo and Lewis "flashed around" a handgun. Cayo and West testified that the gun in the "Dope" video was the one used to kill Griffin.

2. Wilson first contends that the evidence was not sufficient as a matter of constitutional due process to support his conviction for

conspiracy to purchase marijuana. See *Jackson v. Virginia*, 443 U.S. 307, 319 (99 SCt 2781, 61 LEd2d 560) (1979). We evaluate a due-process challenge to the sufficiency of the evidence by viewing the evidence presented at trial in the light most favorable to the verdicts, and asking whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt of the crimes of which he was convicted. *Peacock v. State*, 314 Ga. 709, 714 (2) (b) (878 SE2d 247) (2022). "We leave to the jury the resolution of conflicts or inconsistencies in the evidence, credibility of witnesses, and reasonable inferences to be derived from the facts." *Perkins v. State*, 313 Ga. 885, 891 (2) (a) (873 SE2d 185) (2022) (citation and punctuation omitted).

A person is guilty of conspiracy to commit a crime "when he together with one or more persons conspires to commit any crime and any one or more of such persons does any overt act to effect the object of the conspiracy." OCGA § 16-4-8. A conspiracy requires an agreement between two or more people, but that agreement "need not be express, nor does it require a meeting of the minds to the

8

same degree necessary to form a contract." *Griffin v. State*, 294 Ga. 325, 327 (751 SE2d 773) (2013) (citation and punctuation omitted). Instead, "all that is required is a tacit mutual understanding between persons to pursue a common criminal objective." Id. The mutual understanding may be established either by direct proof or by inference from acts and conduct which "disclose[] a common design…to act together for the accomplishment of the unlawful purpose." *Darville v. State*, 289 Ga. 698, 699 (2) (715 SE2d 110) (2011) (citation omitted).

The evidence here was sufficient to support Wilson's conviction for conspiracy to purchase marijuana. First, there was testimony that Wilson was an active participant in the plan to buy marijuana from Griffin: Wright testified that when Cayo asked to borrow her car to go make the purchase, he was asking on behalf of Wilson and Lewis as well as himself. West testified that she gave Wilson money because "[h]e said he was going to go buy weed." And multiple witnesses testified that Wilson, Cayo, and Lewis divided the marijuana among them after they had obtained it. See *McLeod v.*

9

*State*, 297 Ga. 99, 103 (2) (772 SE2d 641) (2015) ("appellant's shared criminal intent with her co-conspirators may be inferred by her conduct before, during, and after the crimes"). That was enough to show a mutual understanding among Wilson, Cayo, and Lewis to purchase marijuana. Also, the evidence showed that all three did overt acts in furtherance of their plan: among other things, Wilson collected money from West, Lewis contacted Griffin to arrange the purchase, and Cayo obtained Wright's car. This evidence of those overt acts, together with that of the participants' mutual understanding, was sufficient to support Wilson's conviction for conspiracy to purchase marijuana.

3. Wilson contends the trial court erred by denying his special demurrer to quash Count 4 of the indictment. Count 4 charged Wilson (along with Cayo and Lewis) with felony murder for causing Griffin's death "while in the commission of the offense of Conspiracy to Violate the Georgia Controlled Substances Act, a felony." Wilson argued in the special demurrer, as he does on appeal, that the count was not sufficient as a matter of due process because it did not

adequately describe the predicate felony. "We review a ruling on a special demurrer de novo to determine the legal sufficiency of the allegations in the indictment." *Sanders v. State*, 313 Ga. 191, 195 (3) (869 SE2d 411) (2022) (citation and punctuation omitted).

As described in footnote 1, Wilson was convicted of Counts 4 and 7 of the indictment. Count 4 charged Wilson, Cayo, and Lewis with felony murder predicated on conspiracy to violate the Georgia Controlled Substances Act. Count 7, in turn, charged that all three "unlawfully conspired with each other to commit the offense of Purchase of Marijuana, in violation of code section 16-13-30 of the Georgia Controlled Substances Act, and in furtherance of said conspiracy, did do the following overt acts to effect the object of the conspiracy: contacted Tre Griffin to arrange the purchase of marijuana, secured a method of transportation to the residence of Tre Griffin, traveled to the residence of Tre Griffin, and met in person with Tre Griffin." No other count charged any defendant with any violation of the Georgia Controlled Substances Act.

The purpose of an indictment "is to allow the defendant to

11

prepare his defense intelligently and to protect him from double jeopardy." *Jones v. State*, 289 Ga. 111, 116 (2) (c) (709 SE2d 773) (2011) (citation and punctuation omitted). To satisfy due process, the indictment must "contain all the essential elements of the crime" and must "notify the accused of what factual allegations he must defend in court." *Jackson v. State*, 301 Ga. 137, 139, 140 (1) (800 SE2d 356) (2017) (citation and punctuation omitted). The test for determining the constitutional sufficiency of an indictment is not, therefore, whether it could be made more certain and definite, but whether it puts the defendant on notice of the crimes with which he is charged and sufficiently apprises him of what he must be prepared to meet. See *Sanders*, 313 Ga. at 195 (3). When applying this test, "the indictment is read as a whole." Id. at 196 (3) (a) (ii) (punctuation and citation omitted).

Wilson's indictment was constitutionally sufficient. Count 4 charged him with felony murder for causing Griffin's death while committing conspiracy to violate the Georgia Controlled Substances Act; Count 7, in turn, charged him with conspiracy to purchase

12

marijuana in violation of the Georgia Controlled Substances Act, and laid out specific factual allegations supporting that charge. Read as a whole, see *Sanders*, 313 Ga. at 196 (3) (a) (ii), the indictment put Wilson on notice of the crimes charged and the factual allegations he had to defend against. And contrary to Wilson's contention, the details of the predicate felony did not have to be specified in the felony murder count. It was enough that they were specified in the count charging the predicate felony. See id. at 197-198 (3) (a) (iii) (indictment was constitutionally sufficient when Count 1 charged defendant with felony murder for causing victim's death while committing conspiracy to commit aggravated assault, and Count 3 charged him with conspiracy to commit aggravated assault and laid out the factual allegations supporting that charge). The indictment satisfied the requirements of due process and so the trial court did not err in denying Wilson's special demurrer.

4. Wilson next contends the State did not prove that the conspiracy to purchase marijuana proximately caused Griffin's death. He argues that a conspiracy to purchase marijuana is not

13

inherently dangerous, and that he could not have foreseen that his involvement in that crime alone—with no anticipation of an armed robbery or aggravated assault, neither of which he was convicted of—would lead to Griffin's murder.

A person commits felony murder when, "in the commission of a felony, he or she causes the death of another human being irrespective of malice." OCGA § 16-5-1 (c). The causation element requires proof of proximate cause. *Campbell-Williams v. State*, 309 Ga. 585, 587 (2) (a) (847 SE2d 583) (2020). Under the proximate-cause standard, the defendant is liable "for the reasonably foreseeable results of criminal conduct if there is no sufficient, independent, and unforeseen intervening cause." *Menzies v. State*, 304 Ga. 156, 161 (II) (816 SE2d 638) (2018) (citation and punctuation omitted). Any felony can be a predicate for felony murder so long as it is "inherently dangerous to human life," meaning that it is "dangerous per se" or "by its circumstances create[d] a foreseeable risk of death." *Davis v. State*, 290 Ga. 757, 760 (4) (725 SE2d 280) (2012) (citation and punctuation omitted).

Here, the evidence was sufficient for the jury to find that the conspiracy to purchase marijuana proximately caused Griffin's death. We have recognized time and again that transactions in illegal drugs are inherently dangerous. See *State v. Spratlin*, 305 Ga. 585, 595-596 (2) (b) (826 SE2d 36) (2019) ("this Court and others have recognized that violence is inherent in the business of dealing illegal drugs") (punctuation omitted); *Davis*, 290 Ga. at 760-761 (4) (explaining that it is "not unusual" for parties to an illegal drug transaction to be armed, and citing cases noting that it was not unreasonable to expect firearms to be present at a drug transaction or to believe that one's safety was in danger when going to a known drug area). This is because it is among the "incidental, probable consequences" of an illegal drug transaction that something may go wrong and someone may be killed. See *Davis*, 290 Ga. at 760 (4) (defendant proximately caused victim's death when he arranged to purchase marijuana from the victim, "something went wrong," and the defendant's brother shot the victim). Indeed, at Wilson's trial, a homicide detective testified that "at least 75 to 80 percent" of his

homicides involved drug transactions.

Wilson urges that it was not the conspiracy to purchase marijuana but the later plan to rob Griffin—of which he was acquitted—that foreseeably caused Griffin's death. But "[r]egardless of whether an [armed] robbery took place, the [parties] met for a drug transaction and something went wrong"—which was reasonably foreseeable. *Davis*, 290 Ga. at 760 (4). The proximate-cause requirement is satisfied here, so this claim of error fails.

5. Wilson contends that the trial court erred by failing to give his requested jury instruction on proximate cause. We review de novo a properly preserved claim that a trial court erred in refusing to instruct the jury on an applicable principle of law. See *Reese v. State*, 314 Ga. 871, 879-880 (2) (880 SE2d 117) (2022).

Wilson asked for an instruction to the effect that the jury could not convict him of felony murder unless it found beyond a reasonable doubt that he committed a felony that both proximately caused the victim's death and was dangerous enough that it created a foreseeable risk that it would result in the victim's death. The trial

court declined to give that instruction. Instead, the trial court gave

the following instruction on causation for felony murder:

> A person commits armed robbery, aggravated assault, and conspiracy to violate the Georgia Controlled Substance Act as previously defined. In order for homicide to have been done in the commission of these particular felonies, there must be some connection between the felony and the homicide. The homicide must have been done in carrying out the unlawful act and not collateral to it. It is not enough that the homicide occurred soon or presently after the felony was attempted or committed. There must be a legal relationship between the homicide and the felony so as to cause you to find that the homicide occurred before the felony was at an end, or before any attempt to avoid conviction or arrest for the felony. The felony must have a legal relationship to the homicide, be at least concurrent with it in part, and be part of it in the actual and material sense. A homicide is committed in the carrying out of a felony when it is committed by the accused when engaged in the performance of any act required for the full execution of a felony.[2]

The trial court also properly defined felony murder for the jury,

explaining that "[a] person commits the crime of murder, when in

commission of a felony, that person causes the death of another

---

[2] This was the pattern jury instruction at the time. See *Ware v. State*, 305 Ga. 457, 459 (2) (826 SE2d 56) (2019) (citing Georgia Suggested Pattern Jury Instructions, Vol. II: Criminal Cases (4th ed. 2007, updated Jan. 2017), § 2.10.30).

17

human being with or without malice." And the trial court instructed the jury on the various predicate offenses Wilson had been charged with.

Those instructions, taken together, adequately informed the jury about the principles of proximate cause that applied to this case. See *Ware v. State*, 305 Ga. 457, 459-460 (2) (826 SE2d 56) (2019) (concluding that the same set of instructions fully informed the jury that it could not convict the defendant of felony murder unless it found that he committed a predicate felony that proximately caused the victim's death). See also *Campbell-Williams*, 309 Ga. at 588 (2) (a) (jury instructions are "read and considered as a whole in determining whether there is error") (citation omitted). The jury was instructed that it could not convict Wilson of felony murder unless it found that he was guilty of one of the charged predicate felonies; that the murder was "done in the commission of," and "at least concurrent with" and "not collateral to," the predicate felony; and that the predicate felony was related to the murder "in an actual and material sense." Following those instructions—as

18

jurors are presumed to do, see *Hill v. State*, 310 Ga. 180, 190 (6) (850 SE2d 110) (2020)—the jury could not have found Wilson guilty of felony murder unless it found he committed one of the predicate felonies and that that felony proximately caused Griffin's death.

Wilson's requested instruction also would have told the jury that a predicate felony for a felony murder must itself be inherently dangerous. But our "clear precedent" is that such an instruction is not required, even when requested. *Davis*, 290 Ga. at 762 (5) (b). See also *State v. Kelly*, 290 Ga. 29, 34 (2) (b) (718 SE2d 232) (2011) ( "our case law runs contrary to" the notion that a trial court must "instruct the jury explicitly that it must find as an element of the felony murder that the underlying felony…was committed in a manner that created a foreseeable risk of death"). So the trial court's failure to give that part of the instruction was not error.

Because the trial court fully and correctly instructed the jury on the relevant points of law, it was not error to fail to give the additional explanatory instruction that Wilson requested. See, e.g., *Stafford v. State*, 312 Ga. 811, 821 (4) (865 SE2d 116) (2021) (where

19

trial court gave updated version of pattern jury instruction on causation in felony murder, no additional instruction on unforeseen or intervening cause was needed because, "considered as a whole, the charge given by the trial court was a correct statement of the law with regard to proximate cause in a felony murder case"); *Whiting v. State*, 296 Ga. 429, 431 (2) (768 SE2d 448) (2015) (trial court not required to give separate charge on proximate cause when court's instructions "adequately informed the jury that Whiting could only be found guilty of felony murder if the conspiracy to conduct the marijuana transaction was the proximate cause of [the victim's] death") (citation and punctuation omitted).

6. Wilson asked for a jury instruction on conspiracy to possess marijuana as a lesser included felony or misdemeanor offense of conspiracy to purchase marijuana. The trial court declined to give that instruction, and Wilson contends this was error.

A written request to charge a lesser included offense "must always be given if there is any evidence that the defendant is guilty of the lesser included offense." *Soto v. State*, 303 Ga. 517, 520 (2)

20

(813 SE2d 343) (2018) (citation and punctuation omitted). The evidence "does not need to be persuasive, but it must exist." Id. (citation and punctuation omitted). If there is *no* evidence that the defendant committed the lesser offense, then the trial court is justified in refusing to charge on it. Id. And when the evidence shows that the defendant could have committed only the greater offense as charged or no crime at all, an instruction on a lesser included offense is not required. See *Walker v. State*, 311 Ga. 719, 722 (2) (859 SE2d 25) (2021). Whether the evidence warranted the requested instruction is a legal question that we review de novo. See id.

Here, even assuming that conspiracy to possess is a lesser included offense of conspiracy to purchase,[3] the evidence could not support a finding that Wilson was guilty only of conspiracy to possess marijuana and not conspiracy to purchase. It is undisputed that Wilson at least knew about the plan to buy more marijuana

---

[3] The State argues that no instruction on conspiracy to possess was necessary because *actual* possession is not a lesser included offense of conspiracy to purchase. We do not reach that question, but we assume without deciding that *conspiracy* to possess is a lesser included offense of conspiracy to purchase.

from Griffin. If he conspired with Cayo and Lewis to possess that marijuana, it could only have been through that purchase. In other words, the two possible conspiracies were the same: the plan to possess the marijuana necessarily included the step of purchasing it from Griffin. And Wilson could be guilty of that conspiracy even if, as he argues, he did not actively participate in planning the transaction. See OCGA § 16-4-8 ("A person commits the offense of conspiracy to commit a crime when he together with one or more persons conspires to commit any crime and *any one or more* of such persons does any overt act to effect the object of the conspiracy.") (emphasis added); *Martin v. State*, 310 Ga. 658, 661 (1) (852 SE2d 834) (2020) ("all of the participants in a conspiracy are criminally responsible for the acts of each, committed in the execution of the conspiracy, and which may be said to be a probable consequence of the conspiracy, even though the particular act may not actually have been part of the plan") (citation and punctuation omitted). In short, Wilson either was part of the conspiracy to purchase, or he was not involved at all, but he could not have been guilty only of conspiracy

22

to possess. See *Walker*, 311 Ga. at 722-723 (2). So the trial court was not required to give an instruction on that offense as a lesser included offense of conspiracy to purchase. See id.

7. Wilson contends that the trial court erred by declining to give his requested instruction on the proof needed to show his participation in the conspiracy. The requested instruction would have told the jury that Wilson could not be guilty of conspiracy unless the State proved "that a conspiracy existed, that the defendant knew the essential objectives of that conspiracy, and that armed with that knowledge he participated" in the conspiracy.

We see no error because the points of law in Wilson's requested instruction were covered in the court's other instructions. The trial court gave jury instructions that track the current pattern instructions on the defendant's criminal intent, mere presence, and mere association. See Georgia Suggested Pattern Jury Instructions, Vol. II: Criminal Cases (4th ed. 2007, updated Aug. 2022), §§ 1.43.10, 1.43.30, 1.43.31. Those instructions informed the jury that the State had to prove beyond a reasonable doubt that Wilson "knowingly and

intentionally participated in or helped in the commission of" the conspiracy, and that Wilson must be acquitted if the jury found that he did not knowingly or intentionally participate in the conspiracy, that he was merely present at the scene, or that he was merely associated with other guilty parties. See id. §§ 1.43.10, 1.43.30, 1.43.31. We see no meaningful difference between proof that Wilson "knowingly and intentionally" participated in the conspiracy and proof that he "knew the essential objectives of" the conspiracy and "armed with that knowledge…participated" in it. Wilson's requested jury instruction added no essential point of law to the existing instructions, so it was not error for the trial court to decline to give it. See *Francis v. State*, 296 Ga. 190, 194 (2) (766 SE2d 52) (2014) ("[a] trial court does not abuse its discretion in refusing to give a jury charge in the exact language requested when the charge given substantially covers the correct principles of law") (citation and punctuation omitted). See also, e.g., *Stafford*, 312 Ga. at 821 (4) (no additional jury instruction necessary when instructions given adequately covered applicable legal principles).

8. Wilson contends that the trial court erred by admitting evidence that, in Wilson's view, was irrelevant and prejudicial. He challenges two pieces of evidence: the "Dope" rap video and a series of Instagram messages from Wilson to Cayo. We review a trial court's evidentiary rulings for abuse of discretion. See *Jones v. State*, 305 Ga. 653, 655 (2) (827 SE2d 254) (2019).

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." OCGA § 24-4-401. Generally, relevant evidence is admissible. See OCGA § 24-4-402. The standard for relevance is "a liberal one," and relevant evidence is admissible "even if it has only slight probative value." *Jordan v. State*, 313 Ga. 841, 844 (2) (874 SE2d 67) (2022) (citation and punctuation omitted).

Relevant evidence may nevertheless be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice." OCGA § 24-4-403 ("Rule 403"). But the exclusion of evidence under Rule 403 is an "extraordinary remedy" that should

be used "only sparingly." *Jordan*, 313 Ga. at 844 (2) (citation and punctuation omitted). This is because "the major function of Rule 403 is to exclude matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect." *Hood v. State*, 299 Ga. 95, 103 (4) (786 SE2d 648) (2016) (cleaned up). And "[p]rejudice is not 'unfair' simply because it tends to inculpate the defendant in an awful crime." *Morgan v. State*, 307 Ga. 889, 897 (3) (c) (838 SE2d 878) (2020). "[I]nculpatory evidence is inherently prejudicial; it is only when *unfair* prejudice substantially outweighs probative value that Rule 403 permits exclusion." Id. (citation and punctuation omitted). The prejudicial effect of evidence is "unfair" if the evidence has "the capacity…to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged," or an "undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Old Chief v. United States*, 519 U.S. 172, 180 (117 SCt 644, 136 LE2d 574) (1997) (citation and punctuation omitted).

   With these principles in mind, we turn to the two pieces of

evidence that Wilson challenges.

(a) *Rap Video*

As described above, Cayo, Lewis, and Wilson appeared in a homemade rap video entitled "Dope." In the video, Cayo and Lewis "flashed" a handgun and identified it as a Smith & Wesson SD-9, which was capable of having fired the bullet recovered from Griffin's body, and which Cayo and West testified was the murder weapon. Also in the video, Cayo said that he "hit [his] first lick," and in Cayo's proffer (a transcript of which was introduced at trial) he explained how "hitting a lick" is slang for committing a robbery. The video was shot on November 30, 2017—eleven days after the murder—and uploaded to YouTube a few weeks later. In the period between the murder and the shooting of the video, Cayo exchanged messages on Instagram with another person about wanting to sell the gun, but wanting to wait until after he had used it in a video.

The "Dope" video was certainly relevant. Most importantly, it connected the defendants to the murder weapon, and it also implicated Cayo in a robbery, very close in time to the crimes here,

27

thus making it more likely that it was the defendants who possessed the murder weapon and used it to kill Griffin. And although the State also introduced still photos of Cayo and Lewis holding the gun, the video was not merely cumulative: among other things, it added an incriminating context to Cayo's Instagram messages, sent in the days after the crime, about wanting to sell a gun but wanting to use it in a rap video first. The video also furnished further evidence of a conspiracy by showing Wilson, Cayo, and Lewis together in the days after the shooting, brandishing a gun of the same model as the murder weapon and boasting of having committed a robbery. See *McLeod*, 297 Ga. at 103 (2) (criminal intent to participate in conspiracy can be shown by actions after the criminal act).

The video's probative value was not substantially outweighed by the danger of unfair prejudice. A defendant's appearance in a rap video—even one like this one replete with obscenities and racial slurs—is not per se prejudicial. And Wilson does not endeavor to explain what specifically about *this* video might cause unfair prejudice. The video shows the defendants boasting about making

28

money in a violent drug trade, but they were charged with robbing a drug dealer shortly before the video was made. This is not a question of evidence that could inflame the passion of the jury for a reason that is irrelevant to the guilt or innocence of the defendant. Compare *Morgan*, 307 Ga. at 897 (3) (c) (unfair prejudice from video of police officer performing CPR on a baby who had been murdered, when video gave no indication of the identity of the perpetrator), with *Pierce v. State*, 302 Ga. 389, 394-395 (1) (d) (807 SE2d 425) (2017) (no unfair prejudice from video of sexual assault victim sobbing as he described sexual encounter with defendant, because video was "relevant as evidence of the crimes charged"). In short, although the video may have cast Wilson in an unflattering light, it did not do so *unfairly*. So the trial court did not abuse its discretion by admitting the video under Rule 403.[4]

---

[4] Wilson also argues that the rap video was inadmissible as "other act" evidence under OCGA § 24-4-404 (b) ("Rule 404 (b)"). The trial court did not specify on what basis it was admitting the evidence, but it is apparent that the evidence was admitted as intrinsic, not under Rule 404 (b). The State offered the video primarily as relevant evidence under OCGA §§ 24-4-401 and 24-4-402—suggesting Rule 404 (b) only as an alternative basis for admissibility—

29

(b) *Instagram Messages*

Nine months after the murder, after both Wilson and Cayo had been charged, Wilson sent a series of messages to Cayo on Instagram. Wilson wrote, "Congrats," then "Keep grinding," followed by "I miss you too no cap bruh it's jus my lawyer Nd 12 watchin my page," and finally, "It's a lot, but ima chop it up witchu."

Those messages were also relevant. They showed that Wilson and Cayo were still on good terms while they were both being prosecuted for the murder, which tended to make it less likely that Wilson was an unwitting bystander to a murder carried out solely by Cayo or Lewis. The probative value may have been slight, but that is enough to satisfy the relevance standard. See *Jordan*, 313 Ga. at 844 (2). And we see no danger of unfair prejudice from the

_____

and argues only relevance on appeal. The State did not give notice of intent to introduce Rule 404 (b) evidence, see OCGA § 24-4-404 (b) (requiring State to give "reasonable pretrial notice" of its intent to offer such evidence), and no limiting instruction was given as to how the jury could consider the video. Moreover, as discussed above, the video is evidence of the defendants' guilt in *this* crime. See, e.g., *Roberts v. State*, __ Ga. __, __ (2) (b) (880 SE2d 501) (2022) (concluding that evidence placing the murder weapon in the defendant's hands days before the murder was intrinsic to the charged crime and had substantial probative value). We therefore do not address whether it was admissible in the alternative under Rule 404 (b).

messages. Wilson's friendliness with Cayo was a relevant fact, and nothing in the content of the messages hints at an "undue tendency to suggest decision on an improper basis." *Old Chief*, 519 U.S. at 180. The trial court did not abuse its discretion in admitting them.

9. Finally, Wilson contends that the trial court improperly sentenced him to life without parole. He argues that the sentence is unlawful because the jury did not find any aggravating factors in the crime and because the trial court relied on improper considerations. As to the second point, Wilson points to the trial court's remarks, in an order denying his motion to reduce his sentence, that "the evidence points to Wilson being the actual shooter" and that Wilson "fail[ed] to accept and recognize his responsibility."

Neither contention has merit. A defendant convicted of murder is eligible for a sentence of life without parole, regardless of whether any aggravating factors are found. See OCGA § 16-5-1 (e) (1) ("A person convicted of the offense of murder shall be punished by death, by imprisonment for life without parole, or by imprisonment for

life."); *Parks v. State*, 305 Ga. 712, 714 (2) (827 SE2d 669) (2019) (noting that the 2009 revisions to the sentencing statute "remov[ed] requirements that a jury find an aggravating circumstance before imposing the sentence of life without parole") (citation omitted); *Lewis v. State*, 301 Ga. 759, 767 (4) (804 SE2d 82) (2017) ("no additional facts are required to be found by the jury for the imposition of life without parole"). And a trial court, in imposing a sentence, "may consider any evidence that was properly admitted during the guilt-innocence phase of the trial," as well as "the conduct and attitude of the defendant during trial." *Blake v. State*, 273 Ga. 447, 450 (4) (542 SE2d 492) (2001). The trial court is not, in other words, limited to considering only those facts that the jury finds are proven beyond a reasonable doubt. It was within the trial court's discretion to sentence Wilson to life without parole, and the record does not show that the court relied on improper considerations in doing so.

*Judgment affirmed. All the Justices concur.*